1  DILAN A. ESPER (Bar No. 178293)
2  desper@harderllp.com
   HARDER LLP
3  132 S. Rodeo Dr., Fourth Floor
4  Beverly Hills, CA  90212
5  Tel.  (424) 203-1600
   Fax  (424) 203-1601
6
7  Attorneys for Applicant Eurasian Natural
   Resources Corporation Ltd.
8

**FILED**
2018 FEB 26  P 1: 56
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NO. DIST. OF CA.

9              **UNITED STATES DISTRICT COURT**
10           **NORTHERN DISTRICT OF CALIFORNIA**
11
12  In re Application of          No. _____  07 18   80041 MISC.

13  EURASIAN NATURAL            **DECLARATION OF MAGNUS**
    RESOURCES CORPORATION       **BOYD FILED IN SUPPORT OF**
14  LTD.,                       **APPLICATION FOR DISCOVERY**
                                **FOR USE IN A FOREIGN**
15                              **PROCEEDING**
16              Applicant.
17
18
19
20
21
22
23
24
25
26
27
28

FAXED ORIGINAL

{00
088
729
.11 {00088729:9}

# DECLARATION OF MAGNUS BOYD

I, MAGNUS BOYD, declare:

1.     I am a partner at Schillings International LLP acting on behalf of Eurasian Natural Resources Corporation Ltd. ("ENRC"). I have personal knowledge of the facts set forth herein.

2.     The Applicant in this action, ENRC, is a corporation duly incorporated in England & Wales.

3.     ENRC believes that Dechert LLP, a law firm it engaged to obtain legal advice and to conduct an investigation of alleged wrongdoing by an ENRC subsidiary, leaked confidential information to a reporter, Danny Forston, who is located in this District.

4.     The investigation was extremely sensitive and Dechert LLP's communications with ENRC were protected by ENRC's legal advice (i.e., lawyer-client) privilege, as Dechert LLP was engaged to analyze the allegations made by the whistleblower and advise on matters relevant to the subsequent investigation. ENRC provided Dechert LLP with confidential and sensitive instructions and information under the cloak of its privilege and Dechert LLP provided ENRC with confidential and privileged legal advice. The law firm's obligation to maintain the sanctity of ENRC's legal advice privilege and confidentiality continued after the termination of the retainer.

5.     Dechert LLP's legal representation of ENRC was terminated in on or around March 27, 2013. In an exchange of correspondence after termination of the retainer, on April 12, 2013, Dechert LLP wrote a letter to ENRC (the "Letter") which contained allegations of misconduct by ENRC based on confidential information that had been provided by ENRC during the time it was represented by Dechert LLP and privileged legal advice that had been supplied to ENRC. The Letter was later leaked and a copy provided to Danny Fortson, a reporter for *The Sunday Times*, which on

1   April 28, 2013 published two articles describing the Letter and reporting confidential

2   information that had been included in the Letter.  Attached hereto as **Exhibit A** are

3   the Fortson stories.

4        6.     ENRC believes that Dechert LLP was the source of the leak of the

5   Letter to Fortson, because the Letter was highly confidential and only a limited

6   number of people had access to it, and because the law firm had an apparent motive

7   to leak the Letter after the representation had been terminated.

8        7.     Proof, if it is the case, that Dechert LLP was the source of the leak to

9   Fortson would constitute significant and relevant evidence in ENRC's anticipated

10  claim.  In such circumstances, ENRC is likely to bring a claim against Dechert LLP

11  in England in relation to this leak.

12       8.     ENRC has already issued a claim in the English courts against Dechert

13  LLP arising out of matters which occurred during the currency of Dechert LLP's

14  retainer. If Dechert LLP is proved to be the source of the leak of the Letter to

15  Fortson, this would give rise to an additional claim, arising out of Dechert LLP's

16  actions following termination of its retainer.

17       9.     Attached hereto as **Exhibit B** is a true copy of the subpoena that ENRC

18  wishes to serve on Fortson.

19       I declare under penalty of perjury under California and US law that the

20  foregoing is true.

21       Executed February 23, 2018 in London, England.

22

23       _Magnus Boyd._

24

25

26

27

28

# EXHIBIT A



# Heart of darkness

**The ENRC scandal shames regulators and the grandees who sat on its board**

Danny Fortson

April 28 2013, 1:01am.
The Sunday Times



Share   f                     Save  

The letter landed with a stack of others on Beat Ehrensberger's desk 16 days ago. It might as well have been a hand grenade.

The 41-year-old Swiss lawyer with a gleaming bald pate and dark-rimmed glasses had been at ENRC for more than a decade. As general counsel, he knew the £3.5bn FTSE 100 mining giant inside out.

A fortnight earlier, the company had sacked Dechert, the City law firm, from an investigation into corruption allegations at ENRC, just days before it was to update the Serious Fraud Office on its progress.

THE TIMES | Today's sections ⌄   Past six days   My articles   Time ⌄ My account ⌄   Search

The letter was Dechert's reply to the dismissal. It was explosive.

The eight pages detail an astonishing catalogue of alleged corruption, including "payments to African presidents" and $35m (£23m) in cash "misappropriated" when ENRC bought a copper mine in the Congo.

It was further alleged that a probe into operations in Kazakhstan was hindered by "false documents ... evidence of document destruction, and obstruction ... including the creation of a false office". It added: "Electronic wiping tools were used by employees."

        MR PORTER

The revelation of Dechert's letter sets the seal on what has quickly become one of Britain's biggest corporate scandals, raising questions not only over alleged wrongdoing at ENRC but also corporate governance failings and the "light-touch" regulatory regime that allowed it to join the FTSE 100.

On his dismissal, one director famously branded the company 'more Soviet than City' Big names in British business who sat on the board while the company ran amok also face severe damage to their reputations, as do the banks and brokers that brought ENRC to market.

The Dechert letter had immediate results. Within days several top executives who had seen it resigned. Victor Hanna, whom Dechert recommended be suspended from his position as head of Africa operations, took voluntary leave of absence.

A week later, the trio of central Asian tycoons who founded the company — and still own 44% of its shares — hurried out an announcement of a half-formed plan to buy back the group and delist it.

Mehmet Dalman, the former investment banker appointed chairman last year with a house-cleaning mandate, resigned.

The SFO decided it had to act. It had been keeping tabs on the company's "self-report" process for the past two years, and on Thursday it launched a formal criminal investigation into "fraud, bribery, and corruption", and served Dechert with a "Section 2" request. This gives it powers to, "interview people, require them to produce material, or search premises".

The SFO will soon have everything that Dechert uncovered.

When it floated in 2007, ENRC, with 65,000 employees and a portfolio of world-class ferrochrome and iron ore mines across the steppes of central Asia, burnished London's reputation as the preferred destination for the top resources companies.

The UK Listing Authority was so desperate to lure the Kazakh giant that it bent its own rules to allow the founders to sell fewer shares in the offering — and thus maintain tighter control — than normal. Sir Hector Sants, then head of the Financial Services Authority, signed off on the deal.

To assure potential investors that the company would adhere to London's higher corporate governance standards, ENRC appointed a gaggle of City grandees to its board. Among them were Sir David Cooksey, the former Bank of England director who became its £500,000-a-year chairman; Sir Richard Sykes, the former chairman of Glaxo Smith Kline; and Sir Paul Judge, who founded Cambridge University's business school.

ENRC'S predicament can be traced back three summers to a derelict mine outside Kolwezi in the south of the Democratic Republic of Congo.

First Quantum, a Canadian mining company, had spent $700m to bring the site, a bedraggled copper project once owned by the state mining company, back to the brink of production. It would have been a boon for the Congo, whose 75m people earn just over 50p a day, on average.

Yet just as it was about to start production, the government of Joseph Kabila nationalised Kolwezi. The same day, it was sold to a joint venture controlled by Dan Gertler, an Israeli tycoon and Kabila's close friend. The deal caused outrage. First Quantum took its case to the International Court of Arbitration in Paris.

So when ENRC announced in August 2010 that it had paid $175m to buy a controlling stake in Kolwezi and a handful of other mines controlled by Gertler, investors were shocked. It was the sort of deal that Sykes and Judge were supposed to prevent.

Investors didn't know the worst, according to Dechert. In its letter, the law firm said that it had "found evidence that documents had been falsified, the CFO of ENRC plc (and her team) had been misled, and that $35m had been misappropriated" .

ENRC said: "There is no evidence to substantiate these allegations." Gertler declined to comment.

Back then, however, the board was unaware of the alleged wrongdoing. Sykes, the senior independent director, defended the deal. He told The Sunday Times: "If we didn't buy it, someone else would have. We legally bought an asset from someone who was selling it."

Investors were unconvinced and the shares began to sink amid
growing concerns about ENRC's corporate governance.

A boardroom rift deepened several months later when a
whistleblower made allegations of widespread corruption in the
company's core Kazakh operations. Six months after launching an
internal investigation, Sykes and Ken Olisa, another director, were
voted off the board.

The coup was orchestrated by the three founders — Alexander
Mashkevich, Patokh Chodiev, and Alijan Ibragimov. They voted their
44% and were supported by the government of Kazakhstan, which
owned 12%, and rival miner Kazakhmys, which held 26%.

On his dismissal, Olisa famously branded the company "more Soviet
than City".

When Dalman was appointed chairman last February, it was meant to
signal a clean slate. The urbane former investment banker, a Turk
born in Cyprus and brought up in England, had been on the board
since its float. Sources close to Dalman said he thought he could form
a bridge between the board and the Kazakh tycoons. His mandate
was to clean up ENRC and close the growing discount at which it
traded relative to rivals.

Dalman formed a special investigation committee, which comprised
himself, independent director Terence Wilkinson and Felix Vulis, the
chief executive.

The scope of the inquiry soon widened beyond Kazakhstan as
allegations trickled in about potential irregularities related to three
acquisitions in Africa.

These included the 2009 deal to buy Camec, the African miner
founded by former England spin bowler Phil Edmonds, and the 2010
purchase of Chambishi, a $300m copper smelter in Zambia.

Based on interviews with ENRC employees and company documents, Dechert found that the Camec purchase, "involved possible breaches of financial sanctions".

On Chambishi, the law firm claimed to have discovered that "a senior executive had falsely altered inputs into the valuation model, which was relied upon by advisers to the company and board".

It added: "Further information from a whistleblower, together with documentary evidence regarding the making of cash payments to African presidents was to be provided (including that the payment(s) had been sanctioned by a senior executive)".

ENRC said there was "no evidence" to back up the charges.

Skeletons began falling out of other corners of ENRC's cupboard. Last month allegations from the Kazakh investigation were leaked to the press, including claims that a subsidiary had handed contracts worth $100m to companies linked to family members of Zaure Zaurbekova, the chief financial officer.

The charges were later dismissed by the company, which said that Zaurbekova was unaware of the deals.

And the allegations that ENRC employees had destroyed evidence in relation to the Kazakh investigation? The company said: "Disciplinary action has been taken against people involved in misleading ENRC's investigation."

The net, however, appeared to be tightening.

In the middle of last month Dechert briefed ENRC's special committee on its findings over the Africa deals. It said it would bring the SFO up to date at a meeting on April 3.

The fraud watchdog had, to that point, agreed to stand back on the condition that ENRC was genuine in its desire to clean up. The welter of evidence Dechert was about to drop on it might well have forced the SFO to act.

A week before Dechert was set to bring the watchdog up to speed, ENRC fired the firm.

THE announcement by Mashkevich came three weeks later. In a terse stock exchange announcement he revealed that he was considering teaming up with the Kazakh government and his fellow founders to bid for ENRC. It brought a brief respite in the steady downward spiral of the share price.

In the nearly three years since ENRC's first foray into the Congo, its shares have dropped 75%. What was once a £13bn behemoth is now seen as £3.5bn of damaged goods.

Since only 18% of the shares are held by independent investors, Mashkevich and Co would need relatively little money, about £700m, to end its disastrous London outing. Yet it is unclear what bearing, if any, the deal would have on the SFO investigation.

The timing of Dechert's dismissal raised questions about ENRC's commitment to the process. It is thought that Dechert billed millions of pounds for its work on the internal probe and ENRC was dissatisfied with the pace of progress.

The company also cited "improper communications" with the SFO, "unprofessional" handling of the case, and "unauthorised" leaks to the press.

Dechert, which declined to comment for this story, denied all allegations in its letter.

What seems clear is that with ENRC facing a criminal investigation and an uncertain future, investors are likely to welcome an end to their misery, even if it does come in the form of a low-ball bid.

It wasn't that long ago that the company still had its defenders. In an interview with The Sunday Times in 2010, Sir Richard Sykes rebutted criticism of ENRC's adventures in Africa and elsewhere.

"People think that if it's the Congo it must be corrupt, and if it is Kazakh with only 18% free-floated, it must be bad," he said. "It makes a wonderful story, but is it fact or is it fiction?"

He may soon have his answer.

■ When The Sunday Times first reported the revolt among City investors over ENRC's 2010 purchase of a disputed copper mine in the Democratic Republic of Congo ("City fury at Sykes Congo deal"), we had only the faintest inkling of where it might lead.

Since then Sir Richard Sykes, the deal's biggest defender, has been forced out, as has Ken Olisa, an independent director.

An internal investigation "found evidence" of $35m (£23m) in "misappropriated funds" related to the transaction. Last week the Serious Fraud Office launched a criminal investigation, on the heels of a mini-exodus of top executives and directors.

These included Jim Cochrane, the long-serving chief operating officer, and chairman Mehmet Dalman. Victor Hanna, the head of Africa operations, took a voluntary leave of absence. The company confirmed that Sir Paul Judge will step down in June, as will Dieter Ameling, another independent director.

Share       Save 

The fate of ENRC could now be determined by new chairman Gerhard Ammann, a Swiss former accountant who runs a small private bank in Zurich called Bank von Roll.

Share    f  🐦                                      Save  ☆ 



**When businesses are inclusive everyone reaps the rewards. Discover why**

◆ SPONSORED



**How effortless elegance can hide in plain sight**

◆ SPONSORED

THE ⚜ TIMES

GET IN TOUCH

| Contact us | Help |
| The Times Editorial Complaints | The Sunday Times Editorial Complaints |
| Place an announcement | Classified advertising |
| Display advertising | The Times corrections |
| The Sunday Times corrections | |

MORE FROM THE TIMES AND THE SUNDAY TIMES

The Times e-paper   The Sunday Times e-paper   Times Currency Services   The Sunday Times Wine Club

Encounters Dating   Times Print Gallery   The Times Archive   Times Crossword Club

Sunday Times Driving   Times+   The Sunday Times Rich List   Insider City Guides

Good University Guide   Schools Guide   The Brief   Best Places to Live

Best Places to Stay

© Times Newspapers Limited 2018.
Registered in England No. 894646. Registered office: 1 London Bridge Street, SE1 9GF.

Privacy & cookie policy   Syndication   Commissioning Terms   Terms and conditions

Document title: Heart of darkness | The Sunday Times
Capture URL: https://www.thetimes.co.uk/article/heart-of-darkness-jnv93drrc9f
Capture timestamp (UTC): Fri, 23 Feb 2018 23:28:17 GMT

     

▷✕

MR PORTER

# Revealed: scandal at heart of ENRC

**A sacked lawyer's secret letter claims the FTSE 100 miner paid off presidents and tried to block a fraud probe**

Danny Fortson

April 28 2013, 1:01am,
The Sunday Times



Law firm Dechert looked into ENRC operations in Europe and Africa for more than two years

Share              Save  ☆

AN INTERNAL fraud probe at ENRC discovered evidence of widespread corruption at the FTSE 100 miner, including "payments to African presidents", $35m of "misappropriated" cash and "document destruction" by staff trying to derail the inquiry.

The explosive claims, which are denied by the company, were made by Dechert, the City law firm, in an eight-page letter it sent to ENRC after being fired last month from its role leading the internal inquiry.

Document title: Revealed: scandal at heart of ENRC | The Sunday Times
Capture URL: https://www.thetimes.co.uk/article/revealed-scandal-at-heart-of-enrc-vlszh2cghn7
Capture timestamp (UTC): Fri, 23 Feb 2018 23:27:08 GMT

The Serious Fraud Office last week launched a criminal investigation into ENRC. The alleged wrongdoing found by Dechert, which spent more than two years looking into the miner's operations in Kazakhstan and Africa, could form the basis of the SFO's probe. It has served Dechert with a Section 2 notice, which requires the firm to hand over documents gathered during its inquiry. Lord Goldsmith, the former attorney-general who is head of European and Asian litigation at Debevoise & Plimpton, has been hired alongside Fulcrum Chambers to offer legal advice to ENRC's board.

The share price has collapsed in recent months amid an exodus of executives and directors and leaks about alleged fraud at its operations in Kazakhstan and Africa.

The criminal investigation threatens to turn ENRC into one of Britain's biggest corporate scandals. It has also called into question the "light-touch" regulatory regime that has brought a rush of foreign firms to the London Stock Exchange.



MR PORTER

ENRC fired Dechert at the end of March, just a week before the law firm was set to update the SFO on its findings regarding three acquisitions in Africa. A report on Kazakhstan had already been submitted.

The company said it dismissed Dechert for a number of reasons, including "inappropriate commun-ications" with the SFO, alleged "improper billing" and "unprofessional" handling of the investigation.

In its letter of April 12, which has been seen by The Sunday Times, Dechert vehemently denied ENRC's charges. It also gave details of the alleged corruption it had uncovered in the company's operations.

On ENRC's controversial 2010 purchase of a copper mine in the Democratic Republic of Congo, Dechert said it had found "evidence that documents had been falsified, the CFO [chief financial officer] of ENRC (and her team) had been misled, and that $35m had been misappropriated".

On the purchase of a copper smelter in Zambia, Dechert claimed to have found "documentary evidence regarding the making of cash payments to African presidents".

ENRC denied the charges relating to both deals. "There is no evidence to substantiate these allegations," the company said. It added that it had taken "disciplinary action against people involved in misleading the investigation".

Dechert claimed to have found evidence that company employees actively undermined the inquiry it was carrying out into ENRC's operations in Kazakhstan. This allegedly included "document destruction and obstruction to [the] investigation, including the creation of a false office".

The revelations contained in the letter have left a cloud hanging over the company. Earlier this month Alexander Mashkevich, one of the three central Asian tycoons who founded the miner, announced he and his partners were working with the Kazakh government on a takeover bid. Together they own 56% of the shares.

Takeover Panel rules give them three weeks to table an offer. The shares closed on Friday at 269¼p, down nearly a third over the past three months because of weak commodity prices as well as the boardroom upheaval.

Share  ✉ f 🐦                                    Save ☆



Document title: Revealed: scandal at heart of ENRC | The Sunday Times
Capture URL: https://www.thetimes.co.uk/article/revealed-scandal-at-heart-of-enrc-vlszh2cghn7
Capture timestamp (UTC): Fri, 23 Feb 2018 23:27:08 GMT

Last week Mehmet Dalman, the chairman brought in to clean up the company, resigned. His departure followed the resignation of Jim Cochrane, chief operating officer, and several other executives.

Share ✉ f 🐦                                        Save ☆



**Find out how this city is developing a cosmopolitan edge**

◆ SPONSORED

**Here's how to enjoy winter – without the skis**

◆ SPONSORED



THE ⚜ TIMES

GET IN TOUCH

Contact us                    Help

The Times Editorial          The Sunday Times Editorial
Complaints                   Complaints

Place an announcement        Classified advertising

Display advertising          The Times corrections

The Sunday Times
corrections

MORE FROM THE TIMES AND THE SUNDAY TIMES

The Times e-paper      The Sunday Times e-paper    Times Currency Services    The Sunday Times Wine Club

Encounters Dating      Times Print Gallery          The Times Archive          Times Crossword Club

Sunday Times Driving   Times+                       The Sunday Times Rich List  Insider City Guides

Good University Guide   Schools Guide               The Brief                   Best Places to Live

Best Places to Stay

© Times Newspapers Limited 2018.                    Privacy & cookie policy    Syndication    Commissioning Terms    Terms and conditions
Registered in England No. 894646. Registered office: 1 London Bridge Street, SE1 9GF.

Document title: Revealed: scandal at heart of ENRC | The Sunday Times
Capture URL: https://www.thetimes.co.uk/article/revealed-scandal-at-heart-of-enrc-vlszh2cghn7
Capture timestamp (UTC): Fri, 23 Feb 2018 23:27:08 GMT

# EXHIBIT B

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of California ☑

| | |
|---|---|
| In re Application of Eurasian Natural Resources Corp. | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) |
| | ) |
| _____ | ) |
| *Defendant* | ) |

Civil Action No. _____

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:      Danny Fortson, [ADDRESS REDACTED], San Francisco, CA

_____
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: ~~425 Market Street~~ Suite 2200 San Francisco, CA 94105 | Date and Time: |
|---|---|

The deposition will be recorded by this method:   Stenographer and audio/video

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See attachment.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

         *CLERK OF COURT*

                     OR

     _____      _____
         *Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Eurasian Natural Resources Corporation Ltd.                             , who issues or requests this subpoena, are:
Dilan A. Esper, Esq., HARDER LLP, 132 S. Rodeo Dr., Beverly Hills, CA 90212, desper@harderllp.com, (424) 203-1600

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

      I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

      ❑ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

      ❑ I returned the subpoena unexecuted because: _____

_____ .

      Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

      $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

      I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Attachment**

1.     All documents reflecting or constituting communications with and all documents received from Dechert LLP or any of its members, employees, agents, or anyone else acting on their instructions or on their behalf, which refer or relate in any way to ENRC or any of its subsidiaries or affiliates.

2.     All documents describing, reflecting, or constituting communications between Dechert LLP and ENRC, and all documents constituting transmittals or containing any discussion of such communications.